MISSOURI CIRCUIT COURT
TWENTY-SECOND JUDICIAL CIRCUIT
(ST. LOUIS CITY)

| | |
|---|---|
| CITY OF ST. LOUIS | |
| Plaintiff, | Cause No. |
| v. | Division No. |
| CHS TX, INC., D/B/A YESCARE, | |
| Serve: Registered Agent:<br>CT Corporation System<br>120 S. Central Ave<br>Clayton, MO 63105 | |
| LEXINGTON INSURANCE, CO. | |
| Serve: Corporation Service Company<br>251 Little Falls Drive<br>Wilmington, DE 19808 | |
| GREAT MIDWEST INSURANCE CO. | |
| Serve: CSC-Lawyers Incorporating<br>Service Co.<br>221 Bolivar St.<br>Jefferson City, MO 65101 | |
| Defendants. | |

## PETITION FOR DECLARATORY JUDGMENT, BREACH OF CONTRACT AND VEXATIOUS REFUSAL

COMES NOW Plaintiff City of St. Louis ("City") and for its cause of action against Defendants CHS TX, Inc., d/b/a YesCare, Lexington Insurance, Inc., and Great Midwest Insurance Co., states as follows:

## Introduction

In 2014, Plaintiff City contracted with Corizon, LLC ("Corizon") to provide medical treatment services and suicide prevention services to inmates at the City's two jails. Whenever an inmate on "full suicide watch" or another crisis watch status was transferred from the City's jail to a jail in another jurisdiction, Corizon's contract required Corizon to notify staff at the receiving facility that the inmate is on a crisis watch status, including by providing the receiving facility with a summary of the inmate's medical records and a medical flow sheet and transfer of medical information sheet.

Approximately four months after Corizon executed its contract with the City, an inmate under Corizon's care who was on a crisis watch status on the morning of his transfer was transferred from the City's jail to the City of Jennings Detention Center. Among other egregious failures detailed herein, Corizon failed to notify Jennings staff that the inmate was on a crisis watch status, failed to provide Jennings with a summary of the inmate's medical records, and failed to provide Jennings staff with a medical flow sheet or transfer of information sheet. The inmate hung himself in an unsupervised cell hours after arriving at the Jennings Detention Center.

The inmate's family members filed suit against the City, City employee Jermanda Adams ("Adams") and the City of Jennings, among others. With respect to

2

the City of St. Louis and Adams, the plaintiffs alleged that the failure to notify Jennings of the inmate's crisis watch status and failure "to provide medical records and information" to Jennings upon the inmate's transfer caused the inmate's suicide. Plaintiffs also alleged that the suicide stemmed from multiple failures in assessing, processing and treating the inmate prior to his transfer to Jennings. With respect to the claims against the City and Adams, all of the alleged material failures were directed to acts or omissions of Corizon employees and staff.

Beginning in March 2018 and continuing through December 2022, the City and Adams made multiple demands upon Corizon for defense and indemnification. Corizon and its insurer Lexington Insurance Company ("Lexington") repeatedly rejected the City's demands, and City and Adams ultimately settled the Lawsuit for $515,000.

Effective November 1, 2022, CHS TX, Inc., d/b/a YesCare ("YesCare") warranted and represented that it has assumed all responsibilities, rights, liabilities and obligations of Corizon and Corizon Health, Inc. ("Corizon Health"), and their successors in interest related to the City of St. Louis Health Services Agreement executed in November 2019 by and between Corizon and the City ("2019 Agreement), as well as all previous agreements entered into by Corizon or Corizon Health and the City.

Pursuant to the Corizon agreements assumed by YesCare, Yescare was contractually obligated to indemnify the City against any claims or lawsuits stemming from the services provided by Corizon to the City, but Corizon, and later

YesCare, denied responsibility to indemnify the City for claims stemming from the above-referenced inmate suicide. Moreover, Corizon breached its contractual obligation to procure a liability insurance policy providing professional liability insurance to the City, as an additional insured, in the amount of $1,000,000 per occurrence, exacerbating the harm to the City and Adams.

Notwithstanding the breaches of Corizon and YesCare, Lexington Insurance Company ("Lexington") was obligated to defend and indemnify the City as the beneficiary of two policies of insurance furnished by Lexington to Corizon and as an additional insured under the Additional Insured Endorsement. In addition, Defendant Great Midwest Insurance Company provided a performance bond guaranteeing YesCare's performance of its contractual obligations, including the indemnity requirements.

## Parties

1. Plaintiff City is a constitutional charter city organized and existing under Missouri law.

2. Adams, at all times relevant herein, was a City employee assigned to the City's Division of Corrections. Unless otherwise indicated herein, the term "City" includes Adams.

3. Defendant YesCare assumed all responsibilities, rights, liabilities and obligations of Corizon, Corizon Health, and their successors with respect to the City. Ex. 4, 1st Amendment and Extension to the 2019 Health Services Agreement ("Contract Amendment and Extension").

4. At all times relevant, Corizon was a Missouri limited liability company providing correctional health care treatment, services and staffing in the state of Missouri.

5. On information and belief, on or about May 5, 2022, Corizon merged with Corizon Health. Corizon Health remained as the surviving Corporation.

6. Unless otherwise indicated, the term "Corizon" as used herein refers collectively to YesCare and its predecessors, Corizon and Corizon Health.

7. Upon information and belief, YesCare employs former Corizon personnel and staff.

8. Defendant Lexington Insurance Company is a Delaware corporation, and it is headquartered in Boston, Massachusetts.

9. Defendant Lexington provides liability insurance products to the healthcare industry and is a member company of American International Group ("AIG"), a global insurance organization operating in 80 countries and jurisdictions.

10. Defendant Great Midwest Insurance Company ("Great Midwest") is an insurance company incorporated in Texas, with its principal place of business in Houston, Texas.

## Venue and Jurisdiction

11. Venue is proper in this Court because the City of St. Louis is located in the Twenty-Second Judicial Circuit and actions giving rise to the cause of action herein occurred in the City of St. Louis.

12. Jurisdiction is proper in this Court because YesCare is a limited liability company registered to do business in the state of Missouri and has transacted business within the state of Missouri, and further because this declaratory judgment action

involves the interpretation of the rights and obligations of YesCare under a contract executed in Missouri and governed by Missouri law.

13. Jurisdiction is further proper in this Court pursuant to § 506.500, RSMo. because Lexington and Great Midwest transacted business in the state of Missouri and because this declaratory judgment action involves the interpretation of City's rights as a beneficiary to a policy of insurance furnished by Lexington to Corizon and the performance bond procured by YesCare and issued by Great Midwest as surety in favor of the City.

14. Additionally, jurisdiction over this action is proper pursuant to the Declaratory Judgment Act, § 527.020, RSMo., insomuch as Plaintiff seeks a declaration of their rights and obligations under various contracts executed in Missouri.

### Allegations and Claim

15. In June 2014, Corizon and Plaintiff City entered into a Health Care Services Agreement ("2014 Agreement"), in which the City engaged Corizon to provide and arrange for the delivery of medical, behavioral health, dental and related health care and administrative services to inmates under the custody and control of the City at the City's two jail facilities, the Criminal Justice Center ("CJC") and the Medium Security Institution. A true and accurate copy of the 2014 Agreement is attached hereto as Exhibit 1 and incorporated herein.

16. The 2014 Agreement was effective on July 1, 2014 for an initial term of three years and was renewable under like terms for two additional one-year terms thereafter.

17. Among other things, the 2014 Agreement required Corizon to comply with the City of St. Louis Division of Corrections Suicide Prevention Policy ("Suicide Prevention

Policy"). A true and accurate copy of the Suicide Prevention Policy in effect during 2014 is attached hereto as Exhibit 2 and incorporated herein.

18. Corizon and its successors continued to provide medical and other services at CJC through the date this suit is filed.

19. The current contract terms are contained in the 2019 Agreement, as amended. A true and accurate copy of the 2019 Agreement is attached hereto as Exhibit 3 and incorporated herein.

20. In November 2022 the City and YesCare entered into the Contract Amendment and Extension, extending the term of the 2019 Agreement for one year and amending certain terms. A true and accurate copy of the Amendment and Extension is attached hereto as Exhibit 4 and incorporated herein.

21. In the Contract Amendment and Extension, YesCare "warrants and represents that [YesCare], has assumed all responsibilities, rights, liabilities and obligations of Corizon, LLC, and Corizon Health, Inc., and their successors in interest related to the [2019 Agreement] and all previous agreements entered into by Corizon, LLC, or Corizon Health, Inc. and the City of St. Louis." Ex. 4.

**Death of DeJuan Brison**

22. DeJuan Brison ("Brison") was an inmate confined at CJC from October 1, 2014 to October 4, 2014.

23. During his intake screening, Brison reported to a Corizon nurse that he had a history of major depression.

24. On October 2, 2014, Corrections Lieutenant Victoria Ward-Livingston informed a Corizon staff member that Brison had just stated that he was feeling suicidal.

25. Pursuant to the Suicide Prevention Policy, inmate Brison's expression of suicidal thoughts triggered various procedures, requirements and protocols that Corizon staff members were obligated to follow but did not.

26. At approximately 3:25 p.m. on October 2, 2014, a Corizon medical staff member spoke with Brison but failed to document the interaction and failed to note anywhere in Brison's medical records that he had stated he was feeling suicidal.

27. As a result of Brison's statement regarding suicide, and pursuant to the Suicide Prevention Policy then in effect, the City's Corrections staff placed Brison on "full suicide watch" on October 2, 2014, pending his evaluation within 24 hours by a mental health professional employed by Corizon.

28. On October 3, 2014 at approximately 8:45 a.m., Licensed Professional Counselor Fred Barker ("LPC Barker"), a Corizon employee, conducted a mental health assessment of Brison.

29. During his October 3, 2014 examination, LPC Barker failed to review Brison's medical records in conducting his assessment. Because he did not review Brison's medical records, LPC Barker was unaware of, and failed to consider, the fact that Brison had previously reported to the Corizon nurse he had a history of mental health problems. Barker admitted these facts under oath at his April 11, 2022, deposition.

30. Because LPC Barker failed to review Brison's medical records, LPC Barker was also unaware of and failed to consider that, during a prior incarceration in the City in July of 2014, Brison had previously been on "full suicide watch" and had previously been found to be at risk of suicide by Corizon staff. This was documented in Corizon medical records which were available to LPC Barker, but which he failed to review. Barker admitted these facts under oath at his April 11, 2022, deposition.

31. Despite having access to Brison's medical records in which the reason he had been placed on "full suicide watch" should have been documented by Corizon staff, LPC Barker failed to review Brison's medical records and failed to take any steps to investigate why Brison had been placed on "full suicide watch" except to ask Brison. Barker admitted these facts under oath at his April 11, 2022, deposition.

32. During his mental health assessment, Barker failed to document any clinical observations, failed to document any behavioral observations, failed to document Brison's current mental status, and failed to document any lethality assessment – including whether lethality was an active issue and whether Brison had any suicidal ideation. Barker admitted these facts under oath at his April 11, 2022, deposition.

33. During his deposition, LPC Barker testified that he "forgot" to document any lethality assessment – including whether lethality was an active issue and whether Brison had any suicidal ideation.

34. LPC Barker testified that he conducted a "very sparse suicide watch evaluation" that was "missing some things."

35. During his deposition, LPC Barker admitted that his failure to document any clinical observations, failure to document behavioral observations, failure to document Brison's current mental status, and failure to document any lethality assessment is a "clear indication that [he] was working too fast."

36. After conducting his hurried assessment, LPC Barker concluded that Brison was not currently at risk of self-harm, was not suicidal, and downgraded Brison to "close observation."

37. Pursuant to the Suicide Prevention Policy, "close observation" is a crisis watch status.

38. When LPC Barker met with Brison on October 3, 2014, he knew Brison was scheduled to be transferred to another facility.

39. Barker recommended that a follow-up evaluation of Brison be conducted prior to his scheduled transfer on October 4, 2014, but Corizon staff either did not perform a follow-up evaluation or did not document having performed a follow-up evaluation as required.

40. At his April 11, 2022, deposition, LPC Barker admitted that he knew Brison was scheduled to be transferred at the time of Brison's evaluation. Barker further testified that Corizon should have provided City of Jennings officials with medical records advising Jennings of Brison's status and assessment, but that, to the best of his knowledge, Corizon did not do so.

41. If Corizon staff did perform a follow-up evaluation just before Brison was transferred on October 4, 2014, and did take Brison off crisis watch status just before he was transferred, then Corizon failed to document those facts as required and failed to provide documentation that Brison was taken off "close observation" before he was transferred to the City of Jennings as required.

42. Documentation showing that Brison was removed from a crisis watch status before he was transferred would have absolved City and Adams of any potential liability.

43. On the morning of October 4, 2014, Brison was on "close observation" status and was released for transport to the City of Jennings related to an outstanding bench warrant from the City of Jennings Municipal Court.

44. Corizon was required by Sections 5.1 and 5.2 of the 2014 Agreement to comply with City's policies pertaining to the transfer of medical records for inmates on a watch status that are set forth in the Suicide Prevention Policy issued by the City's Corrections Division. See Exhibits 1 and 2.

45. Pursuant to the Suicide Prevention Policy, when an inmate on a crisis watch status is transferred, Corizon medical staff members at CJC were required to contact the receiving facility (Jennings Detention Center in this case) and alert staff of the receiving facility of an inmate's pending transfer. Ex. 2, p. 12.

46. When an inmate is scheduled to be transferred from St. Louis to a jail in a different jurisdiction, the Suicide Prevention Policy provides that medical/mental health

staff must alert the admissions processing staff and give them a copy of the medical screening assessment form. Id.

47. Despite actual knowledge of Brison's pending transfer and of his crisis watch status, Corizon staff failed to alert the admissions processing staff in Jennings and failed to provide the Jennings personnel with a copy of Brison's medical screening assessment form. Corizon medical staff also did not inform Jennings personnel of Brison's crisis watch status prior to transfer.

48. On the afternoon of October 4, 2014, following his arrival at the Jennings Detention Center, Brison hung himself in his Jennings jail cell and died 17 days later.

**Lawsuit and Discovery**

49. On February 17, 2017, Brison's mother, Christina Brooks, filed suit against the City and Adams, among others. The suit was originally styled Brooks v. City of Saint Louis, et al., No. 4:17-Cv-00981 ("Lawsuit"). Following the death of Brison's mother, her aunt Cecilia Perry was appointed Plaintiff Ad Litem, and the Lawsuit was most recently styled Perry v. City of Saint Louis, et al., No. 4:17-cv-00981.

50. Among other allegations and claims in the Lawsuit were claims of negligence against a City employee (Plaintiff Adams) and a claim of deliberate indifference against the City pursuant to 42 U.S.C. § 1983.

51. The Lawsuit alleged negligence with respect to the following acts or omissions that, if accurate, would have been performed, omitted or neglected by Corizon staff members:

(a) Failure to properly assess Brison for any risk of suicide or self-harm; failure to note any such indication in the detainee's medical record; and failure to follow all City policies in regards to the handling of Brison's medical records. Sections 1.2, 5.1, 5.2, and Appendix A ("Scope of Work") of the 2014 Agreement required Corizon to perform said services. Ex. 1, pp. 1-2, 6-7.

(b) Failure to transfer Brison's medical records, including his medical flow sheet or other transfer of medical information sheet, to the City of Jennings. Sections 5.1 and 5.2 of the 2014 Agreement required Corizon to adhere to City policies regarding the maintenance and transfer of medical records, including the City's Suicide Prevention Policy, which specifically required that Corizon transfer Brison's medical records to the City of Jennings upon his transfer. Ex. 1, pp. 6-7; Ex. 2, p. 12.

52. In the Lawsuit, Plaintiffs alleged that the failure to communicate Brison's medical status to staff at the City of Jennings was the direct and proximate cause of his death by suicide.

53. As described above, Corizon employees and staff were responsible for communicating Brison's medical status to staff at the City of Jennings. See e.g., Ex. 1, Sections 1.1, 1.2, 4.3, 5.1, 14; Scope of Work.

54. For example, in Section 14 of the Scope of Work in the 2014 Agreement, Corizon was required to "update [an] inmate's medical record at the point of service, and [to] forward a summary of the record to the appropriate facility in the event of an inmate's transfer." Ex. 1, p. 29. Section A(6)(b) of the Scope of Work provides that

13

"[i]n treating inmates with Severe Mental Illness Corizon will use evidence based practices that include . . . appropriate discharge planning to ensure continuity of care when released from jail." Id. at p. 26. Corizon did not follow these required procedures.

55. Plaintiff alleged in the Lawsuit that Brison was on "full suicide watch" at the time of his transfer because a Corizon medical staff member, Nurse Cramer, noted in a Corizon medical record that Brison was on "full suicide" watch after he was downgraded to "close observation" on the morning of October 3, 2014.

56. Nurse Cramer's notation that Brison was on "full suicide watch" was either a negligent error or, if Brison was in fact "re-upgraded" to "full suicide watch," Corizon failed to communicate that fact to any City employee.

57. Dr. A.E. Daniel, a psychiatrist and a forensic psychiatrist was engaged to provide expert testimony in the Lawsuit on the topics of suicide risk factors, policies, procedures, practice, and standards of care. At his deposition on May 2, 2022, Dr. Daniel, who previously served as head of psychiatric services for Corizon before Corizon changed its name, testified that it was the responsibility of the Corizon medical staff to contact the receiving facility and alert the medical staff of the inmate's pending transfer.

58. As a direct and proximate result of Corizon's alleged failure to transfer Brison's medical records or otherwise communicate his crisis watch status to the City of Jennings, the City and Adams were forced to defend a civil action premised upon

the Corizon staff's failure to communicate Brison's medical status, the cause of his death by suicide.

59. During the pendency of the Lawsuit, the City discovered that Corizon breached certain other terms and provisions of the 2014 Agreement:

    (a) Corizon failed to maintain a comprehensive, accurate, up-to-date and integrated medical health and behavioral health medical record for Brison, as required by Section 14 of the Scope of Work of the 2014 Agreement.

    (b) Corizon failed to forward a summary of Brison's medical records or a Medical Flow Sheet to any officer, employee, or agent of the City of Jennings when Brison was transferred there, as required by Section 14 of the 2014 Agreement's Scope of Work.

    (c) Corizon failed to fax a copy of Brison's Medical Screening Assessment Form to any officer, employee, or agent of the City of Jennings when Brison was transferred to Jennings.

    (d) Corizon and its medical staff knew or should have known that Brison had been placed on suicide watch and knew or should have known that he remained on a crisis watch status at the time of his transfer. Nonetheless, Corizon failed to contact the City of Jennings and alert its staff of Brison's pending transfer as required by the Suicide Prevention Policy.

60. Discovery in the Lawsuit, including the discovery described above, confirmed that the allegations in the Lawsuit were directed to services that Corizon was obligated to provide.

61. After discovery in the Lawsuit revealed that Corizon negligently failed, in breach of its obligations, to transfer Brison's medical records or otherwise communicate his crisis watch status to Jennings, Corizon amended its Complaint to specifically allege that Corizon failed to forward any of Decedent's medical records to Jennings or inform Jennings of Brison's crisis status despite Corizon's actual knowledge that Brison had exhibited and was continuing to exhibit a high risk of suicide. See Ex. 5, Third Amended Complaint, ¶¶ 19, 32, 39, 86, 87(a)-(g), and 88.

62. The City and Adams ultimately agreed to pay Plaintiffs $515,000.00 to settle all claims in the Lawsuit.

63. On December 21, 2022, the United States District Court Eastern District of Missouri Eastern Division issued its Final Judgment and Order approving the $515,000 wrongful death settlement.

**Lexington Insurance Policy Nos. 6797600 and 6797142**

64. Pursuant to the 2014 Agreement, Corizon was obligated to provide and maintain professional liability and general liability and personal injury insurance to cover its operations.

65. In particular Section 10.1 of the 2014 Agreement stated that:

> at all times during the term of [the] Agreement, Corizon will provide and maintain, at its own expense, the following programs of insurance covering its operations hereunder. . . [(a)] workers compensation insurance as required by the State of Missouri[; (b)] professional liability in the amount of $1,000,000 per occurrence and $3,000,000 in aggregate, with the City named as additional insured[, i]f 'claims made' is provided, continuing liability coverage of at least five (5) years must be in force[; (c)] general liability and personal injury insurance up to $3,000,000 with the City named as additional insured.

66. On information and belief, Corizon purchased a Medical Group Professional Liability policy of insurance ("Lexington Policy No. 6797600") from Lexington Insurance with a policy period from January 1, 2014 to January 1, 2015. See Ex. 6.

67. On information and belief, Corizon also purchased a "Healthcare Professional Liability - Claims Made and Healthcare General Liability – Occurrence" Policy Number ("Policy No. 6797142") with a policy period from January 1, 2014 to January 1, 2015. See Ex. 7.

68. Pursuant to Policy No. 6797600, Lexington agreed to pay sums that Corizon becomes "legally obligated to pay others as damages resulting from a medical incident arising out of professional services" for medical incidents taking place during the policy period. Ex. 6, Medical Group Professional Liability Occurrence Coverage Part, p. 1.

69. Endorsement No. 17 to Policy No. 6797600 further provides that "[a]ny organization is included as additional insured if [the Named Insured is] obligated by virtue of a written contract to provide indemnification or insurance as afforded by this Policy to such organization, but only with respect to liability arising out of operations conducted by you or on your behalf." See Id., Endorsement No. 17.

70. Policy No. 6797600's declaration further included a "self-insured retention" ("SIR") of $1,000,000 per "medical incident." Under the policy, the Corizon is solely responsible for the SIR, which "is reduced by the payment of damages and/or defense costs for a covered medical incident." See Id., Endorsement No. 5.

17

71. Policy No. 6797142 is a "Healthcare Professional Liability – Claims Made and Healthcare General Liability – Occurrence" policy. Ex. 7.

72. Policy No. 6797142 provides general liability for occurrences as defined in the policy. Id.

73. Policy No. 6797142 defines an "occurrence" to mean:

   a. "As respects bodily injury . . . or medical expense, an accident, . . . which results in bodily injury . . . neither expected nor intended from the standpoint of the Insured;" or

   b. "as respects personal injury, an offense arising out of [Corizon's] business that results in personal injury."

See Id., Healthcare Professional Liability and Healthcare General Liability, p. 4.

74. Policy No. 6797142 provides that Lexington will "pay those sums that an Insured becomes legally obligated to pay as damages because of bodily injury . . . to which this Coverage Part applies." Id. at Healthcare General Liability Occurrence Coverage Part, p. 1.

75. Policy No. 6797142 further provides that when Lexington has the duty to defend any suit, "it will defend such suit against the Insured for a covered claim seeking damages on account of a medical incident, bodily injury, property damage, personal injury or advertising injury even if such claim or suit is groundless, false or fraudulent." Id. at p. 6.

76. Policy No. 6797142 defines "medical incident" as "any act, error or omission in the providing of or failure to provide professional services." Id. at p. 3.

18

77. Endorsement No. 2 to Policy No. 6797142 is an "Additional Insured Endorsement" and provides that Insureds covered under this policy include: "[a]ny person or organization to whom you are obligated by virtue of a written contract to provide indemnification or insurance as afforded by this Policy, but only with respect to liability arising out of operations conducted by you or on your behalf." Id., Endorsement No. 2.

**Tender of Claims to Corizon and Lexington Insurance**

78. Section 10.2 of the 2014 Agreement and the 2019 Agreement require Corizon to indemnify the City for its negligent conduct. The 2014 Agreement states, in pertinent part:

> Corizon hereby indemnifies and holds the City harmless up to the limits of Corizon's applicable insurance policy, from and against any claims against the City proximately caused by negligence in treatment rendered by Corizon personnel; . . ..

Ex. 1, p. 15.

79. Section 10.2 of the 2019 Agreement states, in relevant part:

> Corizon hereby agrees to defend and indemnify the City, its officials, agents and employees against any and all claims, liens, demands or suits relating to the provisions of services under this agreement.

Ex. 3, p. 12.

80. Corizon and Lexington refused multiple City demands for defense and indemnification with respect to the Lawsuit.

81. On or about March 13, 2018, the City asserted its rights under Section 10.2 of the 2014 Agreement by tendering complete defense of the Lawsuit to Corizon.

82. On or about March 23, 2018, Corizon, through its counsel, refused to accept the City's tender of defense.

83. On or around April 13, 2021, the City renewed its request for representation and indemnification by Corizon in the Lawsuit. Corizon did not respond.

84. After the above-described developments during discovery in the Lawsuit further implicating Corizon, the City sent a third request for representation and indemnification on June 17, 2022. Corizon did not respond to the third request.

85. On or about November 1, 2022, the City served Corizon and YesCare notice that it had materially defaulted in the performance of multiple obligations under the 2014 and 2019 Agreements, by:

    a. failing and refusing to defend and indemnify the City in the Lawsuit pursuant to its obligations under Section 10.2 of the 2014 Agreement and Section 10.2 of the 2019 Agreement;

    b. failing to, pursuant to Section 10.1 of the 2014 Agreement, provide and maintain, at its own expense, professional liability insurance naming the City as an additional insured;

    c. failing to procure and provide the City with a performance bond in an amount equal to 20 percent of the total value of the 2019 Agreement; and

    d. failing, pursuant to Sections 5.6, 10.1 and 10.3 of the 2019 Agreement, to respond to the City's request for complete copies of all insurance policies existing and effective from December 31, 2013 to the date of the request.

86. YesCare responded to the City's November 1, 2022 letter on November 11, 2022, acknowledging that "all responsibilities, rights, liabilities and obligations of Corizon, LLC and Corizon Health, Inc. under the [2014 and 2019] agreements were vested" with YesCare effective May 5, 2022.

**Performance Bond**

87. Despite Corizon's obligation pursuant to Section 10.3 of the 2019 Agreement to purchase a performance bond in the amount equal to 20 percent of the total value of the contract, Corizon failed to purchase such a bond. The 2019 Agreement required the performance bond be in force prior to the award of the contract and remain in force during the initial and any subsequent term of the contract.

88. YesCare acknowledged Corizon's failure to obtain a performance bond pursuant to the terms of the 2019 Agreement in its November 11, 2022 correspondence.

89. On or around December 9, 2022, subsequent to the execution of the Contract Amendment and Extension, by which YesCare assumed the responsibilities, rights, liabilities and obligations of Corizon under the 2014 and 2019 Agreements, YesCare purchased Bond No. GM222765 in the amount of $1,515,969.60 from Great Midwest for the benefit of Obligee City (hereinafter referred to as the "Performance Bond.")

90. The Performance Bond provides that in the event of default of the Contract Amendment and Extension, Great Midwest will have "the right and opportunity, to tender to [City] funds sufficient to pay the cost of completion [of the contract] less the

balance of the Contract price up to an amount not to exceed the penal sum of the bond."

91. The Performance Bond is for the term November 1, 2022 and ending November 1, 2023.

**YesCare's Refusal to Perform under Contract Amendment and Extension**

92. On or about March 1, 2023 the City issued a demand to YesCare for indemnification in the amount of $515,000.00, the amount paid by the City in December 2022 to resolve the claims in the Lawsuit.

93. On or about March 20, 2023 the City issued YesCare its notice of breach and default, detailing Corizon's multiple material breaches of the 2014 and 2019 Agreements and notifying YesCare that Section 10.2 of the 2014 Agreement and Section 10.3 of the 2019 Agreement obligated Corizon to indemnify the City for the $515,000 it paid to settle the claims in the Lawsuit.

94. To date, YesCare has wrongfully failed to tender defense costs or indemnify City for liabilities stemming from the Lawsuit.

95. Exacerbating YesCare's refusal to indemnify the City for liabilities allegedly arising from the acts and omissions of Corizon's personnel, Corizon breached its obligation under the 2014 Agreement to provide and maintain, at its own expense, professional liability insurance in the amount of $1,000,000 per occurrence and $3,000,000 in aggregate; and a general liability and personal injury insurance with up to $3,000,000 in coverage, specifically naming the City as an additional insured.

96. As a direct and proximate result of Corizon's failure to procure liability insurance naming the City as an additional insured and Corizon's denial of its obligations to defend and indemnify the City, the City has been damaged by having to pay $515,000.00 to resolve the Lawsuit to avoid the inconvenience, expenses and uncertainty of trial.

97. Further, as a direct and proximate result of Corizon's breach, City's counsel expended hundreds of hours defending the Lawsuit, causing the City to incur significant attorney's fees as well as other litigation expenses.

98. A justiciable, real, substantial controversy presently exists as to YesCare's contractual obligations to the City. Accordingly, pursuant to § 527.010, R.S.Mo., the City is entitled to a declaration of its rights under the 2014 and 2019 Agreements that Corizon was obligated to defend and indemnify the City and its employees in the Lawsuit, and YesCare, which assumed Corizon's liabilities, is now liable to the City for the $515,000.00 the City paid to resolve this matter and for its attorney's fees and litigation expenses.

99. Plaintiff City has no adequate remedy at law.

**Lexington Insurance Policies**

100. Additionally, on or around March 2018, the City exercised its right to defense and indemnification under Lexington Policy No. 6797600, tendering defense of the Lawsuit to Lexington via letter.

101. On or around March 29, 2018, AIG Claims, the claims administrator for Lexington, responded, disclaiming coverage under Policy No. 6797600 and stating

that "Lexington has no obligation to defend or indemnify unless and until the $1 million SIR has been exhausted" by Corizon.

102. On or around November 4, 2022, City again made a demand to Lexington pursuant to the terms of Policy Nos. 6797142 and 6797600 for indemnification and defense.

103. On November 14, 2022, AIG Claims responded, on behalf of Lexington, to the City's November 4, 2022 correspondence, denying the City coverage under either policy.

104. As one of its bases for denying the City coverage under Policy No. 679714, Lexington incorrectly claimed that the policy had "expired on January 1, 2014 – nine months before the incidents at issue." This is patently untrue. Instead, this policy was effective from January 1, 2014 to January 1, 2015 at 12:01 a.m. The policy is explicit in this regard where it provides: "(b) POLICY PERIOD: From: January 1, 2014     To: January 1, 2015 at 12:01 a.m. Standard Time." Ex. 7, p. 1.

## COUNT I – DECLARATORY JUDGMENT THAT CITY IS ENTITLED TO INDEMNIFICATION BY YESCARE IN PERRY V. CITY OF SAINT LOUIS, NO. 4:17-CV-00981

105. City reasserts and incorporates by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

106. Sections 1.2, 5.1, 5.2, and the Scope of Work of the 2014 Agreement required Corizon to assess Brison for any risk of suicide or self-harm; to note any such

indication in the detainee's medical record; and to follow all City policies in regards to the handling of Brison's medical records.

107. At all times relevant, Section 14 of the Scope of Work required Corizon to transfer Brison's medical records, including his medical flow sheet or other transfer of medical information sheet, to Jennings.

108. Sections 5.1 and 5.2 required Corizon adhere to City policies regarding the maintenance and transfer of medical records, including the City's Suicide Prevention Policy, which specifically required that Corizon transfer Brison's medical records to Jennings upon his transfer.

109. Further, pursuant to Section 4.3 of the 2014 Agreement, Corizon was obligated to provide training to Division of Corrections staff "at least every six months," on topics including suicide prevention and interventions.

110. Pursuant to Section 6(j) of the Scope of Work, Corizon was obligated to conduct "suicide prevention intervention and training for medical, mental health and correctional officer staffs at the facilities."

111. Section F(2)(c) of the Scope of Work obligates Corizon to provide in-service training and continuing educational programs to healthcare staff on an on-going basis throughout the contract period, to include monthly in-service training for healthcare staff on topics that include suicide prevention.

112. As a direct and proximate result of Corizon's failure to transfer Brison's medical records or otherwise communicate his crisis watch status to Jennings,

City and Adams were subjected to a civil action as a result of Brison's death by suicide proximately caused by Corizon's negligent omissions.

113. As a direct and proximate result of Corizon's failure to transfer Brison's medical records or otherwise communicate his crisis watch status to Jennings, the City and Adams bore the risk of an adverse judgment ordering them to pay compensatory and punitive damages, and in order to avoid the inconvenience, expense, uncertainty and risk of trial, City settled the litigation for $515,000.

114. Section 10.2 of the 2014 Agreement stated, as relevant, that: "Corizon hereby indemnifies and holds the City harmless up to the limits of Corizon's applicable insurance policy, from any claims against the City proximately caused by negligence in treatment rendered by Corizon personnel . . ."

115. On or around March 13, 2018, the City exercised its right to defense and indemnification under Section 10.2 of the 2014 Agreement by tendering complete defense of the Lawsuit to Corizon.

116. On or around March 23, 2018, Corizon, through its counsel, refused to accept the City's tender of defense.

117. On or around April 13, 2021, the City renewed its request for representation and indemnification by Corizon in the Lawsuit.

118. Corizon refused to accept the tender of the defense, or otherwise defend and indemnify City, in the Lawsuit.

119. The 2014 Agreement obligated Corizon to defend and indemnify the City and its employees for claims in the Lawsuit for Corizon's failure to adequately render medical record-keeping services.

120. Corizon's refusal to defend and indemnify the City in the Lawsuit was a breach of Corizon's obligation under Section 10.2 of the 2014 Agreement.

121. Corizon's post-2019 failure to defend and indemnify the City in the Lawsuit also was a breach of Corizon's obligations under Section 10.02 of the 2019 Agreement.

122. As a result of Corizon's repeated breach, the City was damaged by having to incur significant costs to defend the Lawsuit over a period of years.

123. As a further result of Corizon's breach, the City incurred $515,000 in damages to settle the Lawsuit.

124. YesCare has assumed the liabilities of Corizon and is therefore liable to the City for Corizon's breach of the 2014 and 2019 Agreements.

125. Accordingly, the City is entitled to a declaration of its rights under the 2014 Agreement, 2019 Agreement, and Contract Amendment and Extension that YesCare is obligated to pay the City all costs it incurred to defend and settle the Lawsuit.

## COUNT II
## YESCARE IS LIABLE FOR CORIZON'S BREACH OF CONTRACT STEMMING FROM ITS FAILURE TO TRANSFER MEDICAL RECORDS PURSUANT TO THE 2014 AGREEMENT

126. City reasserts and incorporates by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

127. Corizon was required pursuant to Section 14 of the Scope of Work of the 2014 Agreement and at all times relevant to maintain a comprehensive, accurate, and integrated medical health and behavioral health medical record for Brison.

128. Section 14 of the Scope of Work also required Corizon to update Brison's medical records at the point of service and to forward a summary of the medical records to Jennings.

129. The Suicide Prevention Policy further required Corizon to fax a copy of the Medical Screening Assessment Form to Jennings.

130. Additionally, the Suicide Prevention Policy required Corizon to contact Jennings and alert the medical staff of Brison's pending transfer.

131. Pursuant to Section 14 of the Scope of Work of the 2014 Agreement, Corizon was required to maintain and forward inmate medical records as provided by City policy.

132. Corizon was aware prior to Brison's transfer to Jennings on October 4, 2014 that he was slated to be transferred to another facility.

133. Corizon was required to contact Jennings to alert medical staff of Brison's pending transfer and to fax a copy of the Medical Screening Assessment Form.

134. Prior to Brison's transfer to Jennings, and at all relevant times thereafter, Corizon failed to transfer any of Brison's medical records to Jennings or any other officer, employee, or agent of the City of Jennings.

28

135. Corizon and its medical staff knew or should have known that Brison had been placed on suicide watch and knew or should have known that he remained on a crisis watch status at the time of his transfer.

136. Corizon was, at the time of Brison's transfer, and at all relevant times thereafter, obligated under the terms of the 2014 Agreement to maintain comprehensive, up-to-date medical records of each detainee at the CJC.

137. Corizon was, at the time of Brison's transfer, required pursuant to Section 14 of the Scope of Work of the 2014 Agreement, to provide Jennings, along with a summary of Brison's medical records, "a Medical Flow Sheet or other transfer of medical information sheet."

138. Corizon was, at the time of Brison's transfer, required, pursuant to the Suicide Prevention Policy, to fax a copy of Brison's Medical Screening Assessment Form to Jennings.

139. Corizon's failure to fully perform the terms of the 2014 Agreement by failing to transfer any form of Brison's medical records to Jennings at the time of his transfer, or at any time thereafter, constitutes a breach of the 2014 Agreement.

140. As a direct and proximate result of Corizon's breach of the 2014 Agreement, City was forced to incur $515,000 in damages plus hundreds of hours of attorney's fees and litigation expenses.

141. YesCare has assumed the liabilities of Corizon and is therefore liable to the City for Corizon's breach of the 2014 Agreement.

## COUNT III
## YESCARE IS LIABLE FOR CORIZON'S BREACH OF CONTRACT STEMMING FROM ITS FAILURE TO PURCHASE A POLICY OF INSURANCE PURSUANT TO SECTION 10.1 OF THE 2014 AGREEMENT

142.    City reasserts and incorporates by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

143.    Pursuant to Section 10.1 of the 2014 Agreement, Corizon was required to provide and maintain, at its own expense, professional liability in the amount of $1,000,000 per occurrence and $3,000,000 in aggregate; and a general liability and personal injury insurance with up to $3,000,000 in coverage, naming the City as an additional insured.

144.    Corizon breached the 2014 Agreement by failing to purchase a policy of professional liability insurance, a policy of general liability and personal injury liability insurance listing the City as an additional insured and providing for professional liability in the amount of $1,000,000 per occurrence and $3,000,000 in aggregate.

145.    Corizon breached its obligations to purchase a policy of professional liability insurance in the amount of $1,000,000 per occurrence because Lexington Policy No. 6797600 contains a SIR declaration requiring Corizon pay at least $1,000,000 in funds towards defense and indemnification costs before Lexington becomes obligated to pay any defense or indemnification expenses to City.

146.    Corizon has failed to pay any amount towards the exhaustion of the SIR declaration related to the City's defense of the Lawsuit.

147. The claims alleged in the Lawsuit accrued when such policies should have been in effect.

148. As a direct and proximate result of Corizon's breach, City has incurred $515,000 in damages and hundreds of hours of attorney's fees and litigation expenses.

149. YesCare has assumed the liabilities of Corizon and is therefore liable to the City for Corizon's breach of the 2014 contract.

## COUNT IV
### DECLARATORY AND INJUNCTIVE RELIEF THAT CITY IS ENTITLED TO COVERAGE UNDER CORIZON'S LEXINGTON INSURANCE POLICY NO. 6797600

150. City reasserts and incorporates by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

151. Lexington furnished Corizon with Policy No. 6797600, a Medical Group Professional Liability policy of insurance in effect from January 1, 2014 through January 1, 2015.

152. Policy No. 6797600 defines a "medical incident" as "any act, error or omission in the providing or failure to provide professional services to any one patient."

153. Corizon's failure to transfer Brison's medical records to Jennings is a "medical incident" as defined in Policy No. 6797600.

154. Endorsement Number 17 stated that "any organization is included as [an] additional insured if [Corizon is] obligated by virtue of a written contract to provide indemnification or insurance as afforded by this policy to such

organization, but only with respect to liability arising out of operations conducted by [Corizon] or on [Corizon's] behalf."

155. The City was at all times relevant, and is, an intended third-party beneficiary of Policy No. 6797600 pursuant to Endorsement Number 17.

156. Part II of the "medical group coverage general policy provisions and conditions applicable to all coverage parts" stated that "when [Lexington has] the duty to defend any suit, [it] will defend such suit against the Insured for a covered claim seeking damages on account of a medical incident even if such claim or suit is groundless, false, or fraudulent."

157. On information and belief, Lexington's claims administrator AIG took inadequate steps to investigate the full scope of Corizon's obligations to the City regarding the transfer of medical records and disregarded evidence provided by the City indicating the allegations of Corizon's misfeasance were not groundless, false, or fraudulent.

158. Lexington's failure to pay any defense or indemnification costs in the Lawsuit amounts to a breach of Policy No. 6797600.

159. Lexington's denial of coverage resulting from its disregard of evidence in the City's March 2018 tender, and from its failure to take adequate steps to sufficiently investigate the scope of Corizon's obligations to the City, amounts to a breach of the implied duty of good faith and a breach of Policy No. 6797600.

160. Accordingly, the City is entitled to declaratory relief that it is a third-party beneficiary pursuant to Policy No. 6797600 and that Policy No. 6797600 applies

to cover the City's damages incurred as a result of Corizon's failure to defend and indemnify it in the Lawsuit.

161. The City is further entitled to declaratory relief that, pursuant to the SIR declaration, YesCare, as Corizon's successor, is obligated to pay City all defense and indemnification expenses associated with the Lawsuit.

## COUNT V
## DECLARATORY AND INJUNCTIVE RELIEF THAT CITY IS ENTITLED TO COVERAGE UNDER CORIZON'S LEXINGTON INSURANCE POLICY NO. 6797142

162. City reasserts and incorporates by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

163. Lexington furnished Corizon with Policy No. 6797142, a healthcare professional liability and healthcare general liability policy of insurance.

164. Policy No. 6797142 defines "medical incident" as "any act, error or omission in the providing of or failure to provide professional services."

165. Pursuant to the 2014 Agreement, Corizon was obligated to provide and arrange for the delivery of medical treatment services and suicide prevention services to Brison.

166. Pursuant to Section 4.3 of the 2014 Agreement, Corizon was obligated to provide training to Division of Corrections staff "at least every six months" on topics including suicide prevention and interventions.

167. Pursuant to Section 6(j) of the Scope of Work, Corizon was obligated to conduct "suicide prevention intervention and training for medical, mental health and correctional officer staffs at the facilities."

168. Section F(2)(c) of the Scope of Work obligated Corizon to provide suicide prevention training to healthcare staff on an on-going basis.

169. In the Lawsuit, Plaintiff alleged that City failed to provide medical treatment services and suicide prevention services to Brison, including, but not limited to: 1) failing to properly assess Brison for risk of suicide or self-harm; 2) failing to note any such indication in Brison's medical record; 3) failing to transfer Brison's medical records to the City of Jennings. See Ex. 5, Third Amended Complaint, Counts I and IV, generally.

170. The Lawsuit further alleged that the City had a policy, practice, or custom of failing to train its employees and that City's failure was the proximate cause of Brison's death. See Id. at Count III, generally.

171. In particular, Plaintiff alleged that the City failed to provide proper training on topics such as: "proper protection and care of detainees;" "screening detainees for serious medical needs; and "identifying recognizable serious medical needs and training in the proper procedures related to such needs." See Id. at ¶75(a)-(c).

172. Count III of the Lawsuit alleged that Brison's death was caused by City's policy, practice, or custom of failing to train its employees to screen detainees for serious medical needs, how to identify serious medical needs and the proper procedures related to such needs.

173. The City is an additional insured pursuant to Endorsement No. 2 to Lexington Policy No. 6797142 because Corizon is obligated by virtue of a written contract to provide indemnification or insurance to the City for occurrences arising out of "any

act, error or omission in the providing of or failure to provide professional services" by Corizon or on behalf of Corizon.

174.   Pursuant to the 2014 Agreement, the scope of professional services Corizon was obligated to provide included suicide prevention and intervention training to City employees.

175.   Policy No. 6797142 provides coverage for "any act, error or omission in the providing of or failure to provide professional services," including healthcare and suicide prevention and intervention training.

176.   Accordingly, the City is entitled to declaratory relief that it is an additional insured of Policy No. 6797142 and that Policy No. 6797142 applies to cover the City's defense and indemnification expenses in the Lawsuit.

### COUNT VI
### YESCARE IS LIABLE FOR CORIZON'S
### BREACH OF DUTY OF GOOD FAITH

177.   City reasserts and incorporates by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

178.   The 2014 and 2019 Agreements contain an implied duty of good faith.

179.   Pursuant to the 2014 Agreement, Corizon was obligated to, but failed to, notify Jennings staff that Brison was on a crisis watch status, provide Jennings with a summary of his medical records, and provide Jennings staff with a medical flow sheet or transfer of information sheet.

180.   Corizon's failures and omissions proximately caused Brison's death and resulted in the City incurring significant expenses to defend and settle the Lawsuit.

181. The 2014 and 2019 Agreements required Corizon to defend and indemnify the City and its employees for claims for damages proximately caused by negligence in treatment rendered by Corizon personnel, including Corizon's misfeasance in failing to notify Jennings staff that Brison was on a crisis watch status and failing to transfer his medical records to Jennings.

182. Pursuant to Section 10.2 of the 2014 and 2019 Agreements, Corizon is obligated to defend and indemnify the City and its agents against any and all claims, demands or suits for claims caused by Corizon's negligent acts or omissions in the provision of medical treatment services and suicide prevention services to inmates.

183. Despite Corizon's duty to defend and indemnify the City for claims caused by the negligence of its employees, Corizon repeatedly refused to accept the City's tender of defense of the Lawsuit and refused to indemnify the City.

184. Corizon's refusal to accept the City's tender of defense and refusal to indemnify the City in the Lawsuit was baseless and in bad faith.

185. Corizon's refusal to accept the City's tender of defense and refusal to indemnify the City in the Lawsuit was a breach of Corizon's duty to act in good faith in the performance the 2014 and 2019 Agreements.

186. Lexington Policy No. 6797600 SIR declaration required Corizon to pay at least $1,000,000 in funds towards defense and indemnification costs before Lexington would pay any defense or indemnification expenses to City.

187. As a result of Corizon's bad faith refusal to accept tender of the defense and to indemnify the City and Adams, the City expended significant resources vigorously defending the Lawsuit and paid more than half a million dollars to resolve the litigation.

188. Corizon has failed to pay any amount towards the exhaustion of the SIR declaration related to the City's defense of the Lawsuit.

189. Corizon's continued failure to pay any amount towards the exhaustion of the SIR declaration has resulted in a denial of the City's coverage benefits under Lexington Policy No. 6797600.

190. Corizon's failure to pay any amount towards the exhaustion of the SIR declaration, despite substantial evidence that its employees' negligence caused or contributed to the death of Brison, was baseless and in bad faith.

191. Additionally, Corizon's refusal to pay any amount towards exhausting the SIR declaration also constitutes a breach of Corizon's duty of good faith under Lexington Policy No. 6797600.

192. As a result of Corizon's breach of its duty of good faith, the City incurred hundreds of hours of attorney's fees and $515,000 in damages.

193. YesCare has assumed the liabilities of Corizon and is therefore liable to the City for damages stemming from Corizon's breach of its duty of good faith.

## COUNT VII
## BREACH OF DUTY OF GOOD FAITH BY LEXINGTON

194. City reasserts and incorporates by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

195. Lexington Policy No. 6797142 obligates Lexington to provide coverage for defense costs and sums the City becomes obligated to pay in any claim seeking damages on account of a bodily injury caused by Corizon, even if such claim or suit was groundless, false or fraudulent.

196. In the instance the SIR declaration does not justify Lexington's denial of coverage, Lexington Policy No. 6797600 further obligates Lexington to provide coverage for defense costs and sums City becomes obligated to pay in any claim seeking damages on account of an alleged act, error or omission in the provision of medical services by Corizon, even if such suit was groundless, false, or fraudulent.

197. Lexington Policy Nos. 6797600 and 6797142 grant Lexington the right to investigate and defend any such claim or suit as it "deems expedient."

198. The claims contained in the Lawsuit arise from errors, omissions and negligent conduct by Corizon employees in failing to notify Jennings staff that Brison was on a crisis watch status and failing to transfer his medical records to Jennings.

199. Lexington is aware that Corizon was obligated pursuant to the 2014 Agreement to notify Jennings staff that Brison was on a crisis watch status and to transfer Brison's records to the receiving jurisdiction but that it failed to do so.

200. Lexington is aware that Corizon's errors, omissions and negligent conduct were the proximate cause of Brison's death.

201. Lexington's denial of coverage to the City under Lexington Policy Nos. 6797600 and 6797142 for indemnification and defense of the Lawsuit, the allegations of

which were premised upon the negligent conduct and omissions of Corizon and its employees, was baseless and in bad faith.

202.   By denying the City defense and indemnification, Lexington breached its duty of good faith in the performance of the terms of the Lexington Policy Nos. 6797600 and 6797142.

203.   As a result of Lexington's breach of its duty of good faith, the City incurred $515,000 in damages and hundreds of hours of attorney's fees defending the Lawsuit.

204.   The City is entitled to damages as a result of Lexington's breach of its duty of good faith under Lexington Policy Nos. 6797600 and 6797142.

**COUNT VIII**
**CITY IS ENTITLED PURSUANT TO § 375.296 AND § 375.420**
**TO ADDITIONAL DAMAGES FOR VEXATIOUS REFUSAL**
**TO PERFORM UNDER INSURANCE POLICY**

205.   City reasserts and incorporates by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

206.   RSMo. § 375.296 entitles a plaintiff to, in addition to the amount due to it under the provisions of a contract of insurance and interest thereon, damages and attorney's fees as provided in § 375.420, where an insurer fails or refuses, for a period of thirty days after a demand is to made, to make payment under the terms and provisions of the contract of insurance.

207.   Lexington Policy No. 6797142 was effective between January 1, 2014 and January 1, 2015.

208. Lexington Policy No. 6797600 was effective between January 1, 2014, and January 1, 2015.

209. On or around March 13, 2018, the City exercised its right to defense and indemnification under Lexington Policy No. 6797600 and tendered defense of the Lawsuit to Lexington.

210. On or around November 4, 2022 the City again made a demand to Lexington pursuant to the terms of Policy Nos. 6797142 and 6797600 for indemnification and defense of the Lawsuit.

211. On November 14, 2022 Lexington wrote to the City, disclaiming coverage under either policy.

212. Lexington's refusal to pay defense costs and indemnify the City in the Lawsuit pursuant to Policy No. 6797142 amounts to a vexatious refusal.

213. In the instance the SIR declaration does not justify Lexington's denial of coverage, Lexington's refusal to pay any defense costs in the Lawsuit, or otherwise indemnify the City under Lexington Policy No. 6797600, amounts to a vexatious refusal.

214. The City was damaged as a result of Corizon's covered actions or omissions, including but not limited to, Corizon's failure to notify Jennings of Brison's crisis watch status and its failure to transfer his medical records to Jennings.

215. On information and belief, Lexington willfully and without cause or reasonable excuse, refused to defend and indemnify City in connection with its defense of the Lawsuit.

216. Such refusal amounts to a breach of Policy Nos. 6797142 and 6797600, and City is entitled pursuant to RSMo. §§ 375.296 and 375.420 to penalties and fees as a result of Lexington's vexatious and unconscionable failure to perform under the policies.

**COUNT IX**
**DECLARATORY JUDGMENT THAT GREAT MIDWEST IS LIABLE TO PAY CITY DAMAGES RESULTING FROM YESCARE'S FAILURE TO INDEMNIFY AND DEFEND**

217. City reasserts and incorporates by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

218. The 2014 and 2019 Agreements required Corizon defend and indemnify the City and its employees for claims for damages proximately caused by negligence in treatment rendered by Corizon personnel or its provision of services under the agreements.

219. Corizon breached its obligations pursuant to the 2014 and 2019 Agreements to indemnify and defend the City in the Lawsuit.

220. Because YesCare assumed the liabilities of Corizon, liability for any breach of the 2014 and 2019 Agreements by Corizon is vested in YesCare.

221. In addition, the defense and indemnity obligations of Corizon's 2014 and 2019 Agreements are currently vested in YesCare, and as such, YesCare is currently in breach of its duty to defend and indemnify the City.

222. As a direct result of YesCare's breach of its contractual duty to defend and indemnify the City, the City has incurred $515,000 in damages, the amount paid

by the City to resolve the claims in the Lawsuit, as well as additional attorney's fees and costs in defending the Lawsuit.

223. The Performance Bond issued by Great Midwest provides that in the event of a default by YesCare, Great Midwest shall pay the City the cost of completion of YesCare's obligations under the Contract Amendment and Extension less the balance of the contract price.

224. Pursuant to the terms of the Performance Bond, Great Midwest has assumed liability for costs incurred by the City as a result of YesCare's breach of the Contract Amendment and Extension stemming from its failure to defend and indemnify the City in the Lawsuit.

225. City is entitled to a declaratory judgment pursuant to § 527.020 that Great Midwest is liable to the City in the amount of $515,000, the amount paid by the City to resolve the claims in the Lawsuit, as well as for all additional costs and attorney's fees the City incurred in defending the Lawsuit.

WHEREFORE, Plaintiff City of St. Louis respectfully requests that this Court enter its judgment in favor of Plaintiff, declaring that:

a) YesCare is contractually obligated to indemnify the City of St. Louis for all expenses incurred in connection with the defense and settlement of the federal court cause styled Perry v. City of Saint Louis, et al., No. 4:17-Cv-0081 and is obligated to compensate the City of St. Louis for its costs and expenses incurred in defending against said claims; and

b) Lexington is obligated pursuant to the term of Policy Nos. 6797600 and 6797142 to indemnify the City of St. Louis for all expenses incurred in connection with the defense and settlement of the above litigation and is obligated to compensate the City of St. Louis for its costs and expenses incurred in defending against said claims; and

c) Great Midwest is liable to the City of St. Louis for all expenses incurred in connection with the defense and settlement of the above litigation and is obligated to compensate the City of St. Louis for its costs and expenses incurred in defending against said claims; and

d) City is entitled to such other relief as this Court deems just and proper.

Dated: June 30, 2023                    Respectfully submitted,

                                        **SHEENA HAMILTON**
                                        **CITY COUNSELOR**

                                        By: Erin McGowan                              #64020

                                        ***Associate City Counselor, Affirmative Litigation Unit***

                                        314 City Hall
                                        1200 Market St.
                                        St. Louis, Missouri 63103
                                        (314) 622-3361 (telephone)
                                        (314) 622-4956 (facsimile)
                                        mcgowane@stlouis-mo.gov