# EXHIBIT E

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| CECELIA PERRY, as Plaintiff Ad Litem for Christina Brooks, and D.B., D.B., D.B., and D.B., by and through their Next Friend, CECELIA PERRY, on behalf of all Beneficiaries, pursuant to Section 537.080, RSMo., | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 4:17-cv-00981-RLW |
| vs. | ) ) | **JURY TRIAL DEMANDED** |
| THE CITY OF ST. LOUIS, JERMANDA ADAMS, KENT MENNING, and THE CITY OF JENNINGS, | ) ) ) ) ) | |
| Defendants. | ) | |

**<u>THIRD AMENDED COMPLAINT</u>**

COME NOW Cecilia Perry, as Plaintiff Ad Litem for Christina Brooks, and D.B., D.B., D.B., and D.B., by and through their Next Friend, Cecilia Perry, on behalf of all beneficiaries permitted to pursue the claims alleged below pursuant to RSMo 537.080 and 42 U.S.C. § 1983, and, for their second amended cause of action against Defendants The City of St. Louis, Jermanda Adams, Kent Menning, and The City of Jennings, allege as follows:

**<u>PARTIES, JURISDICTION, AND VENUE</u>**

1.      Cecelia Perry is the Plaintiff Ad Litem for Christina Brooks who was the natural mother of the decedent, DeJuan L. Brison.

2.      D.B., D.B., D.B. and D.B. are all the natural children of the decent, DeJuan L. Brison ("Decedent"), and, because they are minors, are represented herein by their duly appointed Next Friend, Cecilia Perry (collectively Cecilia Perry as Plaintiff Ad Litem for

EXHIBIT 5

Christina Brooks and D.B., D.B., D.B. and D.B., by and through their Next Friend Cecelia Perry, are collectively referred to herein as "Plaintiffs").

3.      Defendant The City of St. Louis ("Defendant COS") is a municipality located in the State of Missouri and duly formed, organized, and authorized under the laws of the State of Missouri.

4.      At all times relevant to this Complaint, Defendant COS acted through its agents, employees, and servants.

5.      At all times relevant to this Complaint, Defendant COS was responsible for establishing the policies, procedures, and guidelines at issue in this action, for teaching and training its employees, specifically including the correction officers, jailers, and/or auxiliary personnel employed by and/or working for Defendant COS at its St. Louis City Justice Center (the "SCJC"), about those policies, procedures, and guidelines, and for enforcing those policies, procedures, and guidelines to ensure that its employees, specifically including the correction officers, jailers, medical staff, and auxiliary personnel employed by and/or working for Defendant COS at the SCJC complied with the same.

6.      At all relevant times, Defendant Jermanda Adams ("Defendant Adams") was a Corrections Officer for Defendant COS, acting under color of law, and in such capacity as an agent, servant, and employee of Defendant COS, acting under the direction and control of Defendant COS, and was subject to the policies, procedures, guidelines, customs, and practices of Defendant COS.

7.      Defendant Adams is sued herein in her individual capacity.

8.      At all relevant times, Defendant Kent Menning ("Defendant Menning") was a Police Officer for the St. Louis County Police Department, acting under color of law, and in such

capacity as an agent, servant, and employee of St. Louis County Government, under the direction and control of the St. Louis County Police Department, and was thereby subject to the policies, procedures, guidelines, customs, and practices of the St. Louis County Government and the St. Louis County Police Department.

9.     Defendant Menning is sued herein in his individual capacity.

10.     Defendant The City of Jennings ("Defendant COJ") is a municipality located in the State of Missouri and duly formed, organized, and authorized under the laws of the State of Missouri.

11.     At all times relevant to this Complaint, Defendant COJ acted through its agents, employees, and servants.

12.     At all times relevant to this Complaint, Defendant COJ was responsible for establishing the policies, procedures, and guidelines at issue in this action, for teaching and training its employees, specifically including the correction officers, jailers, and/or auxiliary personnel employed by and/or working for Defendant COJ at its City of Jennings Detention Center (the "CJDC"), about those policies, procedures, and guidelines, and for enforcing those policies, procedures, and guidelines to ensure that its employees, specifically including the correction officers, jailers, and/or auxiliary personnel employed by and/or working for Defendant COJ at the CJDC complied with the same.

13.     The Court has personal jurisdiction over each of the defendants named herein because, upon information and belief, each of the defendants named above is a resident of the State of Missouri who was found and served in the State of Missouri and because, as alleged in greater detail below, each of the defendants committed the specific tortious acts and constitutional violations at issue in this action in the State of Missouri.

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1441(c).

15.     The Court is the proper venue for this action because, as alleged in greater detail below, the injury at issue in this action was suffered in St. Louis City and St. Louis County, Missouri, both of which fall within the boundaries of the United States District Court, Eastern District of Missouri.

## ALLEGATIONS COMMON TO ALL COUNTS

16.     At all relevant times, Defendant COS had official policies and procedures applicable to inmates and detainees identified as exhibiting a risk of suicide and placed on suicide watch and/or modified suicide watch (the "COS Suicide Policies").

17.     At all relevant times, Defendant COS was required to teach and train its employees, specifically including its correction officers, jailers, and/or auxiliary personnel employed by and/or working for Defendant COS at the SCJC, about the requirements of the COS Suicide Policies, and to supervise its correction officers, jailers, and/or auxiliary personnel employed by and/or working for Defendant COS at the SCJC and otherwise enforce the COS Suicide Policies to ensure that its employees, specifically including its correction officers, jailers, and/or auxiliary personnel employed by and/or working for Defendant COS at the SCJC, complied with the COS Suicide Policies.

18.     The COS Suicide Policies, among other things, required that a correction officer transferring an inmate or detainee who was on suicide watch or modified suicide watch at the time of transfer inform the receiving, transfer officer that the inmate or detainee was on suicide watch or modified suicide watch and was considered a suicide risk.

4

19.     The COS Suicide Policies, among other things, also required that Defendant COS's medical staff, specifically including its agent Corizon Health, Inc., upon transfer of an inmate or detainee who was on suicide watch or modified suicide watch at the time of transfer provide the inmate or detainee's medical information to the receiving jurisdiction, in order to notify the receiving jurisdiction of the inmate or detainee's status on suicide watch or modified suicide watch and that the inmate or detainee was considered a suicide risk.

20.     The COS Suicide Transfer Policy was mandatory and non-discretionary.

21.     At all relevant times, St. Louis County Police Department had and was subject to certain official policies and procedures applicable to the transfer and conveyance of inmates and detainees by its prisoner transport conveyance officers (the "Conveyance Policies").

22.     The Conveyance Policies, among other things, required any St. Louis County Police Officer assigned to convey an inmate or detainee from the SCJC to the custody of another jurisdiction inquire with the SCJC correctional officer releasing the inmate or detainee into the conveyance officer's custody to confirm that the inmate or detainee did not suffer from any mental or medical conditions, and to report any mental or medical conditions suffered by such an inmate or detainee to the recipient jurisdiction to which the inmate or detainee was being transported (the "Medical Conveyance Policy").

23.     The Medical Conveyance Policy was mandatory and non-discretionary.

24.     At all relevant times, Defendant COJ had official policies and procedures applicable to the intake and screening of all inmates and detainees taken into custody at the CJDC, specifically including policies and procedures promulgated for the express purpose of screening and identifying those inmates and detainees suffered from mental disability and/or a risk of suicide (the "COJ Suicide Policies").

25.     At all relevant times, Defendant COJ was required to teach and train its employees, specifically including its correction officers, jailers, and/or auxiliary personnel employed by and/or working for Defendant COJ at the CJDC, about the requirements of the COJ Suicide Policies, and to supervise its correction officers, jailers, and/or auxiliary personnel employed by and/or working for Defendant COJ at the CJDC and otherwise enforce the COJ Suicide Policies to ensure that its employees, specifically including its correction officers, jailers, and/or auxiliary personnel employed by and/or working for Defendant COJ at the CJDC, complied with the COJ Suicide Policies.

26.     The COJ Suicide Policies, among other things, required that the correctional officers assigned to screening new inmates and detainees (1) interview each new inmate and detainee using a Mental Disability & Suicide Screening form specifically designed to identify those new inmates and detainees at a risk of suicide, (2) obtain answers from each new inmate and detainee to each of the questions contained on the form questionnaire, (3) refuse to accept transfer and take custody of any new inmate or detainee who was identified to be at a risk of suicide, due to Defendant COJ's admitted inability to provide adequate protections for inmates and detainees exhibiting a risk of suicide, or (4) to the extent that Defendant COJ was forced to take custody of such a new inmate or detainee for any period of time, place the new inmate or detainee, then hold such inmate or detainee in accordance with the policies applicable to inmates or detainees deemed to exhibit a risk of suicide, which policies required, among other things, cell checks to be performed every 30 minutes.

27.     The COJ Suicide Policies were mandatory and non-discretionary.

28.     On October 1, 2014, Decedent was arrested by Defendant COS, placed into the custody and control of Defendant COS, and booked and detained by Defendant COS at the SCJC.

29.     On October 2, 2014, while still in the custody and control of Defendant COS and detained at the SCJC, Defendant COS determined that Decedent exhibited a risk of suicide and placed Decedent on suicide watch.

30.     At all relevant times thereafter, while in the custody of Defendant COS and detained at the SCJC, Decedent continued to exhibit a risk of suicide and continued to be designated by Defendant COS as on either suicide watch or modified suicide watch.

31.     On October 4, 2014, while Decedent was continuing to exhibit a risk of suicide and remained designated by Defendant COS as on either suicide watch or modified suicide watch, Defendant COS agreed to transfer custody of Decedent to Defendant COJ.

32.     As of that date, Corizon Health, Inc., as the agent of Defendant COS and acting within the course and scope of its agency with Defendant COS for purposes of providing medical staff services at the prison facility, had an obligation pursuant to its agreements with Defendant COS and the COS Suicide Transfer Policies to provide Decedent's medical records to the receiving jurisdiction, specifically including Decedent's medical records reflecting Decedent's suicide watch status and the fact that Defendant COS, by and through its agent Corizon Health, Inc., had determined that Decedent was at a high risk of suicide.

33.     As of that date, Defendant Adams was employed by Defendant COS as a correctional officer at the SCJC.

34.     As of that date, Defendant Adams' duties included transferring Decedent and other inmates and detainees into the custody of Defendant COJ via a St. Louis County Conveyance Officer.

35.     Defendant Adams' duties in this regard were governed and controlled by the COS Suicide Policies, specifically including the mandatory, non-discretionary COS Suicide Transfer Policies.

36.     As of that date, Defendant Menning was employed by the St. Louis County Police Department as an officer.

37.     As of that date, Defendant Menning was assigned as the St. Louis County Conveyance Officer tasked with transporting Decedent and other inmates and detainees from the custody of Defendant COS to the custody of Defendant COJ.

38.     Defendant Menning's duties in this regard were governed and controlled by the mandatory and non-discretionary Medical Conveyance Policies.

39.     On that date, Defendant COS, by and through its agent Corizon Health, Inc., failed to forward any of Decedent's medical records to Defendant Menning and Defendant COJ and thereby failed to inform Defendant Menning and Defendant COJ of the fact that Decedent was on suicide watch at the time of transfer and that Defendant COS, by and through its agent Corizon Health, Inc., had actual knowledge that Decedent had exhibited and was continuing to exhibit a high risk of suicide.

40.     Defendant COS's medical staff's failure to comply with the applicable, mandatory, non-discretionary COS Suicide Policies and the medical staff's deliberate indifference to Decedent's risk of suicide and associated medical needs was the direct result of Defendant COS's systemic, widespread, consistent, and complete failure to train, educate, and

enforce the COS Suicide Policies to ensure that its medical staff at SCJC were complying with the COS Suicide Policies, to the extent that Defendant COS condoned and cultivated a situation where the COS Suicide Policies, for all intents and purposes, did not exist, despite it being acknowledged by Defendant COS that the COS Suicide Policies were promulgated and necessary for the purpose of protecting inmates and detainees, such as Decedent, from the otherwise inevitable violation of their constitutional rights through the deliberate indifference to their medical needs arising from their risk of suicide.

41.     On that date, Defendant Adams released Decedent to Defendant Menning for the purpose of transferring custody of Decedent to Defendant COJ without informing Defendant Menning or Defendant COJ of the fact that Decedent had been deemed by Defendant COS to exhibit a risk of suicide, that Defendant COS had placed Decedent on suicide watch and/or modified suicide watch, or that Decedent continued to be on suicide watch and/or modified suicide watch at the time of the transfer.

42.     Defendant Adams' failure to comply with the applicable, mandatory, non-discretionary COS Suicide Policies and otherwise exhibit deliberate indifference to Decedent's risk of suicide and associated medical needs was the direct result of Defendant COS's systemic, widespread, consistent, and complete failure to provide Defendant Adams or any of its other employees at the SCJC with any education or training regarding the existence or application of the COS Suicide Policies, as well as its systemic, widespread, consistent, and complete failure to monitor and enforce the COS Suicide Policies to ensure that Defendant Adams and its other employees at the SCJC were complying with the COS Suicide Policies, to the extent that Defendant COS condoned and cultivated a situation where the COS Suicide Policies, for all intents and purposes, did not exist, despite it being acknowledged by Defendant COS that the

COS Suicide Policies were promulgated and necessary for the purpose of protecting inmates and detainees, such as Decedent, from the otherwise inevitable violation of their constitutional rights through the deliberate indifference to their medical needs arising from their risk of suicide.

43.     On that date, Defendant Menning accepted transfer of Decedent for purposes of transporting him to the custody of Defendant COJ without inquiring about and/or otherwise taking any action to confirm the mental and health status of Decedent to identify that Decedent had been deemed by Defendant COS to exhibit a risk of suicide, that Defendant COS had placed Decedent on suicide watch and/or modified suicide watch, or that Decedent continued to be on suicide watch and/or modified suicide watch at the time of transfer, failed to obtain Decedent's medical information, transported Decedent to the custody of Defendant COJ despite having not obtained such information, and otherwise failed to comply with any of the applicable, mandatory, non-discretionary Conveyance Policies applicable to the same.

44.     In the alternative to the allegations stated in the prior paragraphs, to the extent that Defendant Adams did inform Defendant Menning that Decedent had been deemed by Defendant COS to exhibit a risk of suicide, that Defendant COS had placed Decedent on suicide watch and/or modified suicide watch, and/or that Decedent continued to be on suicide watch and/or modified suicide watch at the time of transfer, then Defendant Menning failed to convey that information to Defendant COJ, transported Decedent to Defendant COJ despite the knowledge that Defendant COJ did not accept custody of detainees exhibiting suicidal tendencies, and otherwise failed to comply with any of the applicable, mandatory, non-discretionary Conveyance Policies applicable to the same.

45.     On that date, Defendant Menning did deliver Decedent into the custody and control of Defendant COJ at the CJDC.

46.     Upon accepting custody and control of Decedent, Defendant COJ, by and through its employees at the CJDC, failed to comply with the applicable, mandatory, non-discretionary COJ Suicide Policies by, among other things:

      a.    Failing to obtain answers to all of the questions on the Mental Disability & Suicide Screening form from Decedent;

      b.    Failing to interview Decedent individually in order to obtain answers to all the questions on the Mental Disability & Suicide Screening form;

      c.    Forging answers for Decedent on the Mental Disability & Suicide Screening form;

      d.    Failing to release Decedent from custody due to Defendant COJ's known and admitted inability to adequately detain inmates and detainees exhibiting a risk of suicide; and/or

      e.    Otherwise failing to take any of the steps dictated by the COJ Suicide Policies to identify the serious medical concerns, specifically including the signs of suicidal ideation exhibited by Decedent.

47.     As a result of these failures, Defendant COJ, by and through its employees at the CJDC decided to maintain custody of Decedent and continue to detain him at the CJDC.

48.     In the course of the ongoing detention by Defendant COJ at the CJDC, Defendant COJ, by and through its employees at the CJDC, continued to fail to comply with the applicable, mandatory, non-discretionary suicide policies by, among other things:

      a.    Continuing to fail to identify the risk of suicide exhibited by Decedent;

      b.    Failing to detain Decedent in a four-man cell so that Decedent could be easily observed and monitored;

      c.    Failing to prohibit Decedent from accessing blankets and other implements capable of being used in a suicide attempt; and/or

      d.    Failing to observe, monitor, and check Decedent on the schedule required by the COJ Suicide Policies.

49.     The failure of Defendant COJ's employees to comply with the applicable, mandatory, non-discretionary COJ Suicide Policies and otherwise exhibit deliberate indifference

11

to Decedent's risk of suicide and associated medical needs was the direct result of Defendant COJ's systemic, widespread, consistent, and complete failure to provide any of its other employees at the CJDC with any education or training regarding the existence or application of the COJ Suicide Policies, as well as its systemic, widespread, consistent, and complete failure to monitor and enforce the COJ Suicide Policies to ensure that its employees at the CDJC were complying with the COS Suicide Policies, to the extent that Defendant COJ condoned and cultivated a situation where the COJ Suicide Policies, for all intents and purposes, did not exist, despite it being acknowledged by Defendant COJ that the COJ Suicide Policies were promulgated and necessary for the purpose of protecting inmates and detainees, such as Decedent, from the otherwise inevitable violation of their constitutional rights through the deliberate indifference to their medical needs arising from their risk of suicide.

50.     On that date, at 12:57 p.m., while in the custody of Defendant COJ and detained at the CDJC, Decedent fastened a blanket around his neck and tied it to the bars of his jail cell door.

51.     On that date, at 1:21 p.m., Defendant COJ's employees at the CDJC discovered Decedent hanging from his door and left him hanging from his door.

52.     On that date, at 1:38 p.m., EMS transported Decedent to Barnes-Jewish Hospital, at which time Decedent was unconscious and in critical condition and was placed on life support.

53.     Decedent never regained consciousness, and as a result of the injuries he sustained in the CJDC, he died seventeen days later on October 21, 2014.

## COUNT I
## (Negligence – Defendant Adams)

54.     Plaintiffs reallege and replead each and every allegation contained in paragraphs 1 through 53 of this Complaint as if fully set out herein.

55.     Defendant Adams knew that Decedent had been deemed to exhibit a risk of suicide, that Decedent had been placed on suicide watch, and that Decedent had continued to be on suicide watch and/or modified suicide watch at all relevant points in time up to and including the time at which Defendant Adams released Decedent to the custody and control of Defendant Menning for the purpose of transferring custody and control of Decedent to Defendant COJ.

56.     Defendant Adams had a mandatory, non-discretionary duty to inform Defendant Menning and/or Defendant COJ of the fact that Decedent had been deemed to exhibit a risk of suicide, that Decedent had been placed on suicide watch, and that Decedent had continued to be on suicide watch and/or modified suicide watch at all relevant points in time up to and including the time at which Defendant Adams released Decedent to the custody and control of Defendant Menning for the purposes of transferring custody and control of Decedent to Defendant COJ; to provide medical records and information to Defendant Menning and/or Defendant COJ regarding Decedent's mental and medical condition; to comply with all applicable COS Suicide Transfer Policies, and to otherwise exercise ordinary care in the performance of her duties to ensure that Defendant Menning and/or Defendant COJ were aware of Decedent's mental and medical condition, so that the condition could be adequately addressed by Defendant Menning and/or Defendant COJ.

57.     Defendant Adams breached her duties and was negligent in one or more of the following respects:

     a.    Failing to inform Defendant Menning and/or Defendant COJ that Decedent had been deemed to exhibit a risk of suicide;

     b.    Failing to inform Defendant Menning and/or Defendant COJ that Decedent had been placed on suicide watch by Defendant COS;

     c.    Failing to inform Defendant Menning and/or Defendant COJ that Decedent had continued to be on suicide watch and/or modified suicide watch at all relevant points in time up to and including at the time at which

Defendant Adams released Decedent to the custody and control of Defendant Menning;

d.     Failing to provide medical records and information to Defendant Menning and/or Defendant COJ for Decedent;

e.     Failing to access and review the information available for Decedent in order to determine what information Defendant Adams was required to provide to Defendant Menning and/or Defendant COJ;

f.     Failing to adequately protect Decedent in connection with his serious medical needs;

g.     Failing to properly document Decedent's serious medical needs;

h.     Failing to otherwise comply with the applicable, mandatory and non-discretionary COS Suicide Policies, specifically including the COS Suicide Transfer Policies; and/or

i.     Otherwise exhibiting complete indifference to the known medical needs of Decedent, including his known risk of suicide and his suicide status.

58.     As a direct and proximate result of one or more of the negligent acts identified above, Decedent died.

59.     As a direct and proximate result of one or more of the negligent acts identified above, Decedent was subjected to extreme pain, suffering, physical and emotional injury, fear, and shock prior to his death.

60.     As a direct and proximate result of one or more of the negligent acts identified above and Decedent's resulting death, Plaintiffs sustained pecuniary losses, expenses for Decedent's funeral and burial, and the loss of Decedent's companionship, comfort, counsel, support, guidance, and instruction.

61.     The acts of Defendant Adams were intentional, wanton, malicious, oppressive, reckless, and/or callously indifferent to the rights of Decedent, thus entitling Plaintiffs to an award of punitive damages against Defendant Adams.

WHEREFORE, Plaintiffs pray the Court enter judgment in Count I in favor of Plaintiffs

and against Defendant Adams, awarding:

    a.    Compensatory damages in excess of Two Million Dollars
          ($2,000,000.00);

    b.    Punitive damages in excess of Five Million Dollars ($5,000,000.00);

    c.    Reasonable attorney's fees and costs incurred in this action; and

    d.    Such other and further relief as the Court deems just and proper, together
          with costs.

### COUNT II
### (Negligence – Defendant Menning)

62.    Plaintiffs reallege and replead each and every allegation contained in paragraphs 1

through 61 of this Complaint as if fully set out herein.

63.    Defendant Menning had a mandatory, non-discretionary duty to inquire and

confirm Decedent's mental and medical status, specifically including whether Decedent had or

was continuing to exhibit a risk of suicide while in the custody of Defendant COS, and to then

convey that information to Defendant COJ.

64.    Defendant Menning breached his duties and was negligent in one or more of the

following respects:

    a.    Failing to inquire as to Decedent's mental and medical status;

    b.    Failing to confirm Decedent's mental and medical status;

    c.    Failing to obtain medical records and information regarding Decedent;

    d.    Failing to document Decedent's serious medical needs;

    e.    Failing to convey Decedent's mental and medical status to Defendant
          COJ;

    f.    Failing to provide medical records and information regarding Decedent to
          Defendant COJ;

    g.    Failing to adequately protect Decedent in connection with his serious
          medical needs;

h.  Failing to otherwise comply with the applicable, mandatory and non-discretionary Conveyance Policies; and/or

i.  Otherwise exhibiting complete indifference to the known medical needs of Decedent, including his known risk of suicide and his suicide status.

65.  As a direct and proximate result of one or more of the negligent acts identified above, Decedent died.

66.  As a direct and proximate result of one or more of the negligent acts identified above, Decedent was subjected to extreme pain, suffering, physical and emotional injury, fear, and shock prior to his death.

67.  As a direct and proximate result of one or more of the negligent acts identified above and Decedent's resulting death, Plaintiffs sustained pecuniary losses, expenses for Decedent's funeral and burial, and the loss of Decedent's companionship, comfort, counsel, support, guidance, and instruction.

68.  The acts of Defendant Menning were intentional, wanton, malicious, oppressive, reckless, and/or callously indifferent to the rights of Decedent, thus entitling Plaintiffs to an award of punitive damages against Defendant Menning.

WHEREFORE, Plaintiffs pray the Court enter judgment on Count II in favor of Plaintiffs and against Defendant Menning, awarding:

e.  Compensatory damages in excess of Two Million Dollars ($2,000,000.00);

f.  Punitive damages in excess of Five Million Dollars ($5,000,000.00);

g.  Reasonable attorney's fees and costs incurred in this action; and

h.  Such other and further relief as the Court deems just and proper, together with costs.

## COUNT III
### (42 U.S.C. § 1983 – Defendant COS)

69.     Plaintiffs reallege and replead each and every allegation contained in paragraphs 1 through 68 of this Complaint as if fully set out herein.

70.     Count III is for damages related to violations of Decedent's constitutional rights brought pursuant to 42 U.S.C. §1983. Plaintiffs allege that Defendant COS showed deliberate indifference to Decedent's serious safety and medical needs, thus depriving Decedent of his constitutional rights under the Fourth, Eighth, and Fourteenth Amendments.

71.     Plaintiffs further allege that Defendant COS maintained policies, practices, and customs demonstrating deliberate and complete indifference to the constitutional rights of its citizens, and that said conduct caused the deprivation of Decedent's rights secured under the United States Constitution, the laws of the United States, and the laws of the State of Missouri.

72.     In committing the acts stated herein, Defendant COS acted under color of law to deprive Decedent of certain constitutional rights protected under the Fourth, Eighth, and Fourteenth Amendments, including but not limited to the following:

   a.      The right to be protected from self-inflicted harm;

   b.      The right to medical treatment for serious medical needs;

   c.      Engaging in conduct of abuse of power and authority which shocks the conscience and offends human dignity.

73.     At all times relevant, Defendant COS, acting through its agents and employees, was responsible for making policy for the SCJC and its employees at the SCJC were acting pursuant to either official policy or the practice and customs of Defendant COS and the SCJC.

74.     Acting under color of law, and pursuant to official policy, or custom and practice, Defendant COS intentionally, knowingly, recklessly, and with deliberate indifference to the rights of the detainees of Defendant COS and the SCJC failed to hire, instruct, train, supervise,

17

EXHIBIT 5

control, and/or discipline on a continuing basis its employees, jailers, auxiliary personnel, and its medical staff in the performance of their duties, which resulted in the direct deprivation of Decedent's constitutional rights.

75.     The policies, practices, customs, and usage of Defendant COS directly caused and were the moving force of the constitutional violations inflicted on Decedent, including the following:

    a.    As a matter of policy, practice, and/or custom, failing to undergo and/or provide training related to proper protection and care of detainees;

    b.    As a matter of policy, practice, and/or custom, failing to provide proper training related to screening detainees for serious medical needs;

    c.    As a matter of policy, practice, and/or custom, failing to provide proper training related to identifying recognizable serious medical needs and training in the proper procedures related to such needs, including Decedent's;

    d.    As a matter of policy, practice, and/or custom, failing to identify serious medical needs and the proper procedures related to such needs, including Decedent's;

    e.    As a matter of policy, practice, and/or custom, failing to provide adequate supervision over detainees in order to provide appropriate medical care to detainees in its custody and control, including Decedent; and

    f.    As a matter of policy, practice, and/or custom, failing to train employees on the proper transfer of detainees with serious medical needs;

    g.    As a matter of policy, practice, and/or custom, failing to staff the transfer of detainees with serious medical needs;

    h.    As a matter of policy, practice, and/or custom, failing to supervise the transfer of detainees with serious medical needs;

    i.    As a matter of policy, practice, and/or custom, encouraging the type of misconduct at issue by failing to adequately train, supervise, and control corrections officers, jailers, and auxiliary personnel; and/or

    j.    As a matter of policy, practice, and/or custom, failing to train, teach, and enforce the requirement that its medical staff, operated by and through its agent Corizon Health, Inc., abide by its duties to provide medical information to a receiving jurisdiction upon transfer of an inmate or

detainee who has been deemed to be at risk of suicide and is on a suicide watch status.

76.     Defendant COS's failure to properly hire, train, supervise, staff, and discipline its officers, jailers, auxiliary personnel, and medical staff resulted in an atmosphere where the failure to identify and document serious medical issues and report that information through the proper channels by its officers and medical staff is routinely accepted and its officers and medical staff are led to believe that their actions will not be scrutinized. This atmosphere leads to abuse by these officers, jailers, auxiliary personnel, and medical staff such as that which occurred in the instant case.

77.     Defendant COS's failure to hire, train, supervise, staff, control, and discipline its officers and medical staff was unreasonable, and Defendant COS is not entitled to qualified or sovereign immunity under Missouri or Federal law.

78.     Defendant COS had final decision-making authority to establish municipal policy, practices, and custom.

79.     Defendant COS instituted policies, practices, and customs relating to hiring, firing, training, and supervising officers' conduct and staffing of officers, jailers, auxiliary personnel, and medical staff.

80.      The aforementioned policies, practices, customs, and procedures by Defendant COS demonstrate a deliberate indifference to the constitutional rights of its citizens. By the actions described above, Defendant COS, acting under color of law, directly led to the deprivation of Decedent's right to be protected from self-inflicted harm and Decedent's right to medical treatment for serious medical needs.

81.     As a direct and proximate result of Defendant COS's acts, Decedent was caused to suffer extreme emotional and physical pain resulting in his death.

19

82.     As a direct and proximate result of Defendant's acts, Decedent was subjected to extreme pain, suffering, physical and emotional injury, fear, and shock prior to his death.

83.     The acts of Defendant COS were intentional, wanton, malicious, oppressive, reckless, and/or callously indifferent to the rights of Decedent, thus entitling Plaintiffs to an award of punitive damages against Defendant COS.

84.     In the event that Plaintiffs prevail, they are also entitled to an award of attorney's fees and costs pursuant to 42 U.S.C. §1983.

WHEREFORE, Plaintiffs pray the Court enter judgment in Count II in favor of Plaintiffs and against Defendant City of St. Louis, awarding:

     a.     Compensatory damages in excess of Two Million Dollars ($2,000,000.00);

     b.     Punitive damages in excess of Five Million Dollars ($5,000,000.00);

     c.     Reasonable attorney's fees and costs incurred in this action; and

     d.     Such other and further relief as the Court deems just and proper, together with costs.

### COUNT IV
### (Negligence – Defendant COS)

85.     Plaintiffs reallege and replead each and every allegation contained in paragraph 1 through 84 of this Complaint as if fully set out herein.

86.     Defendant COS, by and through its agent Corizon Health, Inc. which operated the medical staff at SCJC within the course and scope of its agency with Defendant COS, had an affirmative duty pursuant to its own COS Suicide Policies to identify prisoners exhibiting a high risk of suicide, properly record that information in medical records, and then provide that information to a receiving jurisdiction whenever an inmate or detainee who has exhibited a high risk of suicide and been placed on suicide watch is transferred to the receiving facility.

87.     Defendant COS, by and through its agent Corizon Health, Inc. which operated the medical staff at SCJC within the course and scope of its agency with Defendant COS, breached these duties in one or more of the following ways:

a.      Failed to forward Decedent's medical records, which reflected his suicidal status, to Defendant COJ;

b.      Failed to otherwise inform Defendant COJ that Decedent had been deemed by Defendant COS's medical staff to be at a high risk of suicide and placed on suicide watch status;

c.      Failed to otherwise inform Defendant COJ that Decedent continued to be placed on full suicide watch by Defendant COS's medical staff up to and at the moment of Decedent's transfer;

d.      Failed to properly document the interaction whereby Decedent expressed suicidal tendencies;

e.      Failed to review medical records when determining Decedent's suicide risk status;

f.      Failed to document clinical observations, behavioral observations, current mental status, a lethality assessment, and whether Decedent had any suicidal ideation in the records when assessing Decedent's mental health, despite actual knowledge that Decedent was at a high risk of suicide; and

g.      Failing to perform a follow-up evaluation of Decedent prior to his transfer despite such an evaluation being required in order to transfer Decedent to the receiving jurisdiction.

88.     As a direct and proximate result of one or more of the negligent acts identified above, Decedent died, in that, had Defendant COS, by and through its agent Corizon Health, Inc., properly identified and recorded Decedent's risk of suicide and then provided that information to Defendant COJ, as required, Defendant COJ would not have accepted transfer of Decedent and would not have left him unobserved under conditions ripe for a suicide attempt.

89.     As a direct and proximate result of one or more of the negligent acts identified above, Decedent was subjected to extreme pain, suffering, physical and emotional injury, fear, and shock prior to his death.

90.     As a direct and proximate result of one or more of the negligent acts identified above and Decedent's resulting death, Plaintiffs sustained pecuniary losses, expenses for Decedent's funeral and burial, and the loss of Decedent's companionship, comfort, counsel, support, guidance, and instruction.

91.     The acts of Defendant COS were intentional, wanton, malicious, oppressive, reckless, and/or callously indifferent to the rights of Decedent, thus entitling Plaintiffs to an award of punitive damages against Defendant COS.

92.     Defendant COS is not entitled to sovereign immunity on this claim because Defendant COS is insured under an insurance policy that provides coverage for the claims at issue in this action, specifically including the personal injury and wrongful death claims asserted in this Count IV, with limits of at least $2,000,000.00 and has, therefore, waived sovereign immunity for purposes of these claims up to that amount or whatever additional amount of coverage exists.

WHEREFORE, Plaintiffs pray the Court enter judgment on Count IV in favor of Plaintiffs and against Defendant COS, awarding:

     i.     Compensatory damages in excess of Two Million Dollars ($2,000,000.00);

     j.     Punitive damages in excess of Five Million Dollars ($5,000,000.00);

     k.     Reasonable attorney's fees and costs incurred in this action; and

     l.     Such other and further relief as the Court deems just and proper, together with costs.

## COUNT V
## (42 U.S.C. § 1983 – Defendant COJ)

93.     Plaintiffs reallege and replead each and every allegation contained in paragraphs 1 through 92 of this Complaint as if fully set out herein.

94.     Count V is for damages related to violations of Decedent's constitutional rights brought pursuant to 42 U.S.C. §1983. Plaintiffs allege that Defendant COJ showed deliberate indifference to Decedent's serious safety and medical needs, and deprived Decedent of his constitutional rights under the Fourth, Eighth, and Fourteenth Amendments of the Constitution.

95.     Plaintiffs further allege that Defendant COJ maintained policies, practices, and customs demonstrating deliberate and complete indifference to the constitutional rights of its citizens, and that said conduct caused the deprivation of Decedent's rights secured under the United States Constitution, the laws of the United States, and the laws of the State of Missouri.

96.     In committing the acts complained of herein, Defendant COJ acted under color of law to deprive Decedent of certain constitutional rights protected under the Fourth, Eighth, and Fourteenth Amendments, including but not limited to the following:

     a.     The right to be protected from self-inflicted harm;

     b.     The right to medical treatment for serious medical needs;

     c.     The right to be free from bodily harm;

     d.     Engaging in conduct of abuse of power and authority which shocks the conscience and offends human dignity.

97.      At all times relevant, Defendant COJ, acting through its agents and employees who were responsible for making policy for the CJDC, was acting pursuant to either official policy or the practice, custom, and usage of Defendant COJ and the CJDC.

98.     Acting under color of law, and pursuant to official policy or custom and practice, Defendant COJ intentionally, knowingly, recklessly, and with deliberate indifference to the rights of the detainees of Defendant COJ and the CJDC failed to hire, instruct, train, supervise, control, and/or discipline, on a continuing basis, its employees and other jailers and auxiliary personnel in the performance of their duties, which resulted in the direct deprivation of

Decedent's constitutional rights.  The policies, practices, customs, and usage of Defendant COJ

directly caused and were the moving force of the constitutional violations inflicted on Decedent,

including:

    a.    As a matter of policy, practice, and/or custom, failing to undergo and/or provide training related to proper protection and care of detainees under its care;

    b.    As a matter of policy, practice, and/or custom, failing to supervise detainees in its care in order to protect detainees under their care;

    c.    As a matter of policy, practice, and/or custom, failing to provide proper training related to screening detainees for serious medical needs;

    d.    As a matter of policy, practice, and/or custom, failing to provide training related to identifying recognizable serious medical needs and the proper procedures related to such needs, including Decedent's;

    e.    As a matter of policy, practice, and/or custom, failing to identify serious medical needs and the proper procedures related to such needs, including Decedent's;

    f.    As a matter of policy, practice, and/or custom, failing to provide adequate supervision over detainees in order to provide appropriate medical care to detainees in its custody and control, including Decedent; and

    g.    As a matter of policy, practice, and/or custom, as a matter of both policy and practice, encouraging the type of misconduct at issue by failing to adequately train, supervise, and control corrections officers, jailers, and auxiliary personnel.

99.     Defendant COJ's failure to properly hire, train, supervise, staff, and discipline its

officers, jailers, and/or auxiliary personnel resulted in an atmosphere where negligent behavior

by its officers is routinely accepted, and its officers are led to believe that their actions and their

use of improper and illegal procedures will not be scrutinized. This atmosphere leads to abuse by

these officers, jailers, and/or auxiliary personnel, such as that which occurred in the instant case.

Defendant COJ's failure to hire, train, supervise, staff, control, and discipline its officers was

unreasonable and Defendant COJ is not entitled to qualified or sovereign immunity under Missouri or Federal law.

100.    Defendant COJ had final decision-making authority to establish municipal policy, practice, and custom.

101.    Defendant COJ instituted policies, practices, and customs relating to hiring, firing, training, and supervision of officer conduct and staffing of officers, jailers, and/or auxiliary personnel.

102.    The aforementioned policies, practices, customs, and procedures by Defendant COJ demonstrate a deliberate indifference to the constitutional rights of citizens.

103.    By the actions described above, the Defendant COJ, acting under color of law, directly led to the deprivation of Decedent's:

      a.    Right to be protected from self-inflicted harm;

      b.    Right to medical treatment for serious medical needs; and

      c.    Right to be free from unreasonable intrusion on one's bodily integrity.

104.     As a direct and proximate result of Defendant COJ's acts, Decedent was caused to suffer extreme emotional and physical pain resulting in his death.

105.     As a direct and proximate result of Defendant's acts, Decedent was subjected to extreme pain, suffering, physical and emotional injury, fear, and shock prior to his death.

106.    The acts of Defendant COJ were intentional, wanton, malicious, oppressive, reckless, and/or callously indifferent to the rights of Decedent, thus entitling Plaintiffs to an award of punitive damages against Defendant.

WHEREFORE, Plaintiffs pray the Court enter judgment in Count V in favor of Plaintiffs and against The City of Jennings, awarding:

      a.    Compensatory damages in excess of Two Million Dollars ($2,000,000.00);

b.     Punitive damages in excess of Five Million Dollars ($5,000,000.00);

c.     Reasonable attorney's fees and costs incurred in this action; and

d.     Such other and further relief as the Court deems just and proper, together with costs.

## COUNT VI
### (Negligence – Defendant COJ)

107.    Plaintiffs reallege and replead each and every allegations contained in paragraphs 1 through 106 of this Complaint as if fully set out herein.

108.    The individuals at the CJDC who screened, took custody of, monitored, supervised, and otherwise interacted with Decedent at the CJDC were employees and agents of Defendant COJ acting within the course and scope of their employment by and agency with Defendant COJ, at all relevant times.

109.    At all relevant times, Defendant COJ, by and through its employees and agents, was responsible for providing Decedent with appropriate medical care and supervision.104. JDCCO Defendants were employed by and/or acting as agents of the COJ.

110.    On October 4, 2014, Defendant COJ, by and through its employees and agents, caused and/or allowed Decedent to hang himself from his cell door.

111.    At all relevant times, Defendant COJ, by and through its employees and agents, had a duty to provide protection and monitor Decedent while he was under Defendant COJ's custody and control.

112.    At all relevant times, Decedent did not have the capacity to protect himself.

113.    As a direct and proximate result of Decedent's high anxiety, lack of medical attention, placement in solitary confinement, and emotional injury, Decedent was caused or provoked into killing himself while in the custody and control of Defendant COJ.

114.    As a direct and proximate result of COJ's negligent supervision, monitoring, training, staffing, and the actions of, by, and through its employees and agents, and the dangerous condition of the CJDC, as more fully hereinafter set out, Decedent was caused great physical, emotional, and psychological harm that directly and proximately resulted from the recklessness and negligence of the COJ in the following manner:

      a.     Failure to undergo and/or provide training related to proper protection and care of detainees under its care;

      b.     Failing to provide proper protection and care of detainees under its care;

      c.     Failure to provide proper training regarding the screening of detainees for serious medical conditions;

      d.     Failure to conduct adequate screening of detainees for serious medical conditions;

      e.     Failure to provide training related to identifying recognizable serious medical needs and the proper procedures related to such needs, including Decedent's;

      f.     Failure to identify serious medical needs and proper procedures related to such needs, including Decedent's;

      g.     Failure to provide adequate supervision over detainees in order to provide appropriate medical care to detainees in its custody and control, including Decedent;

      h.     As a matter of both policy and practice, encouraged the type of misconduct at issue by failing to adequately train, supervise, and control corrections officers, jailers, and auxiliary personnel; and/or

      i.     Forging information in connection with the screening of a detainee for serious medical needs.

115.    Moreover, at the time of Decedent's detention, the CJDC was in a dangerous condition in the following respect:

      a.     The jail cells were secluded from the view of corrections officers and staff, allowing for insufficient monitoring and supervision, and allowing for the suicide of inmates without detection;

      b.     The video surveillance system was not properly maintained, supervised,

and/or operated, allowing for the suicide of inmates without detection;

c.    The failure of the video surveillance equipment resulted in corrections officers, jailers, and auxiliary personnel being left entirely unsupervised or monitored when not in the direct view of a supervisor or supervising officer;

d.    The failure of radio equipment resulted in corrections officers being unable to notify others of emergency situations in a timely manner; and

e.    The cells included materials, such as blankets, that were readily available to inmates with serious medical needs and used for the purpose of committing suicide.

116.    The dangerous condition of the CJDC, which was negligently created by Defendant COJ's employees and agents and about which Defendant COJ had notice, created a reasonably foreseeable risk of the type of harm sustained by Decedent.

117.    Despite notice of the dangerous condition, the COJ failed to remedy said condition.

118.    As a direct and proximate result of the carelessness and negligence of the COJ, Decedent was subjected to extreme emotional and physical pain, injury, and suffering resulting in his death.

119.    As a direct and proximate result of the COJ's negligence, Plaintiffs sustained losses because of Decedent's death in the nature of pecuniary losses, as well as the loss of Decedent's companionship, comfort, counsel, support, guidance, and instruction.

120.    As a direct and proximate result of one or more of the above referenced negligent acts or omissions, Decedent was subjected to extreme pain, suffering, physical and emotional injury, fear, and shock prior to his death.

121.    As a direct and proximate result of the COJ's negligence, Plaintiffs were required to incur expenses for the decedent's funeral and burial.

122.    The acts of Defendant COJ, by and through its employees and agents, were intentional, wanton, malicious, oppressive, reckless, and/or callously indifferent to the rights of Decedent, thus entitling Plaintiffs to an award of punitive damages against Defendant.

123.    Defendant COJ has purchased an insurance policy that provides coverage for the claims at issue in this action, specifically including the personal injury and wrongful death claims asserted in this Count VI, with limits of $2,000,000.00 and has, therefore, waived sovereign immunity for purposes of these claims up to that amount.

WHEREFORE, Plaintiffs pray the Court enter judgment in Count V in favor of Plaintiffs and against The City of Jennings, awarding:

a.    Compensatory damages in excess of Two Million Dollars ($2,000,000.00);

b.    Punitive damages in excess of Five Million Dollars ($5,000,000.00);

c.    Reasonable attorney's fees and costs incurred in this action; and

d.    Such other and further relief as the Court deems just and proper, together with costs.

Respectfully submitted,


/s/ Todd R. Nissenholtz
Todd R. Nissenholtz, #55049MO
COFMAN & TOWNSLEY, L.L.P.
200 S. Hanley Road, Suite 1070
St. Louis, Missouri 63105
314.621.2005
314.621.3118 (facsimile)
tn@cofmantownsley.com

and

Jerryl T. Christmas, #45370MO
JERRYL T. CHRISTMAS & ASS., L.L.C.
6101 Delmar Blvd. Suite A
St. Louis, MO 63112
314-361-2500
314-361-2525 Fax
christmaslaw@yahoo.com

*Attorneys for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that, on November 16, 2022, the foregoing pleading was filed with the Clerk of Court using the Court's electronic filing system and was served by operation of the same on the counsel of record for all parties to this action.


/s/ Todd R. Nissenholtz